## UNITED STATES  DISTRICT COURT
## EASTERN DISTRICT OF LOUISIANA

**EHAB MOHAMED**                                        **CIVIL ACTION**

**VERSUS**                                                   **NO.  14-2903**

**SETH SMITH, WARDEN**                          **SECTION "N"(5)**

## REPORT AND RECOMMENDATION

This matter was referred to the undersigned United States Magistrate Judge to conduct a hearing, including an evidentiary hearing, if necessary, and to submit proposed findings and recommendations for disposition pursuant to 28 U.S.C. §636(b)(1)(B) and (C), and as applicable, Rule 8(b) of the Rules Governing Section 2254 Cases in the United States District Courts.  Upon review of the entire record, the Court has determined that this matter can be disposed of without an evidentiary hearing. See 28 U.S.C. § 2254(e)(2).  For the following reasons, **IT IS RECOMMENDED** that the petition for *habeas corpus* relief be **DISMISSED WITH PREJUDICE** as untimely.

### I.  *Procedural and Factual History*

Petitioner, Ehab Mohamed, is a state prisoner incarcerated in Elayn Hunt Correctional Center in St. Gabriel, Louisiana.  On February 13, 2008, a jury found him guilty as charged of forcible rape.[1] The Louisiana First Circuit Court of Appeal summarized the facts determined at trial as follows:

---

[1] State Rec., Vol. 1 of 4, Bill of Information; Jury Verdict.

The victim was eighteen years of age at the trial and seventeen years of age when she was a cashier at I.H.O.P., at the time of the offense. The victim did not have a vehicle and would rely on friends to transport her to and from work. She lived in Lacombe, Louisiana, with a friend. The defendant was one of the victim's managers. The fact that the defendant took the victim to his apartment on the date in question is not in dispute. However, the victim testified that the defendant took her to his apartment against her will and despite her requests to be taken home. The victim further testified, "I can't for my life fight him off, because I'm just more little [sic] than him. So I didn't know what to do." When asked what part of the defendant's body was inside what part of her body, the victim responded, "He put his dick in my coochie." She further testified that she cried, was in shock, and could not contact anyone by telephone. The defendant walked out of the apartment and came back in before taking the victim home. The victim spent several subsequent days in her room crying.

The victim ultimately went to the restaurant to pick up her check and told Kristene Haste, an assistant manager at the time, her version of the incident. Haste testified that the victim was very upset, pale, crying, and shaking. Haste also testified that she never observed any behavior between the defendant and the victim to indicate that they were romantically involved. According to Haste, the defendant on occasion committed such inappropriate acts as grabbing her underwear when she bent over and trying to look down her shirt. She further testified that on one occasion she went to the defendant's apartment complex to visit a friend, and visited the defendant at his apartment as her friend was not home. On this occasion the defendant kissed her and she told him that she had a boyfriend. Haste did not go to the defendant's apartment on any other occasion. As elicited during cross-examination, Haste did not report the defendant's behavior.

According to the testimony of Julie Sciple (the victim's childhood friend) she called the victim on January 30, 2007, after not hearing from her in a few days. Sciple testified that the victim sounded odd and did not want to talk. She finally spoke to the victim in person a few days later. Sciple described the victim as being distressed at that time. After the victim told her about the incident in question, Sciple took the victim to the police to report the incident.

Detective Steve Gaudet of the St. Tammany Parish Sheriff's Office testified that the victim's report was filed on February 3, 2007. Gaudet described the victim as seventeen years of age at the time and petite, specifically, four feet eleven

inches to five feet tall, and weighing approximately ninety pounds. A warrant for the defendant's arrest was issued after attempts were made to corroborate the victim's statement including interviews with Sciple, Shelly Solano, Haste, and Tina McGivney. Also, telephone records were obtained.

Shelley Solano, an I.H.O.P. server, was acquainted with the victim. Solano testified that she experienced several incidents at work when the defendant's behavior was inappropriate. According to Solano, the defendant bruised her arm on one occasion by pinching her skin. The defendant later commented, "Oh, you thought about me every time you took a shower." Solano further testified that the defendant placed his hands inside her apron on one occasion. She reported the defendant's behavior to the store owner.

Tina McGivney was an assistant manager at I.H.O.P. when the defendant was the general manager. According to her testimony, McGivney and the defendant initially had a friendly working relationship. She testified that they went to an Arabic restaurant on one occasion in order to become familiar with each other as business partners. Afterwards, they went to the defendant's apartment to watch a movie. McGivney wanted to smoke a cigarette on the defendant's balcony. The defendant did not want her to smoke the cigarette on the balcony and told her to go to his bedroom instead because he had a fan in there. The defendant told McGivney to sit on his bed and she sat on the edge of the bed and smoked her cigarette. The defendant came in the bedroom and laid on the bed. The defendant put his arm around her neck, kissed her, and touched her breast. McGivney told the defendant to stop and he complied. Further incidents occurred at work. Specifically, the defendant would rub his knee against McGivney's knee and would approach her while her back was turned and "rub up against me." The defendant also looked down her shirt and touched her breast one day at work. The defendant did not stop when she told him to stop. McGivney further testified that she filed store complaints regarding the defendant's behavior. McGivney was ultimately fired. The defendant told McGivney that she was being fired because a biscuit was left on a shelf. On cross-examination, McGivney confirmed that she had a DWI conviction but denied that her termination was due to her being inebriated at work.

The defendant denied any inappropriate comments or touching. Specifically the defendant stated that he did not try to kiss Haste and when asked why she would make such a claim, he responded, "She-well-it's just the obligation of what I know of Ms. Kristene Haste. And, you know, she just-I think it's kind of

sort of an invention." The defendant further testified that he had to suspend Solano a few times due to excessive tardiness, dress code violations, and for "drug dealing from the restaurant." The defendant testified that he fired McGivney for coming to work late and inebriated.

The defendant testified that on the date in question, he took the victim to The Price Is Right Auto Sales to meet the owner, Raouf Elghorayeby. The defendant had met with Elghorayeby on two occasions. According to the defendant, Elghorayeby was not present when he took the victim to the dealership, so he gave one of the dealership employees his business card and told him to have Elghorayeby call him upon his return. The defendant further testified that he then took the victim to a grocery store in Lacombe where her roommate worked. The victim entered the store while the defendant waited. When she returned, she asked the defendant to take her back to the dealership. According to the defendant, he informed the victim that they would be going to his apartment to "drop some stuff off" before returning to the dealership. Once they arrived at his apartment complex, the defendant invited the victim to eat pizza in his apartment while they waited to hear from Elghorayeby. The defendant further testified that his roommate, whom he identified as Soloman, was present at the time watching a movie. The defendant fell asleep in his bedroom while the victim and Soloman watched the movie. The defendant woke up when his telephone rang. When he left his bedroom he saw the victim and stated, "My God, I'm sorry, I forgot all about you." The victim was ready to go home so the defendant drove her home. The defendant stated that he did not rape the victim but remembered her returning to work a week later and making the claim. At the time of the trial, the defendant was unaware of Soloman's whereabouts.

On or near February 4, 2007, the defendant traveled to Egypt where his wife and children were, as one of his children was disabled and had to have a surgical procedure. The defendant contacted the store owner while in Egypt to give him an update on his child's condition. The owner told the defendant about the victim's report to the police. According to the defendant, he made attempts to find out if the police were looking for him. The defendant was working in Charleston, South Carolina, when he voluntarily waived extradition to Louisiana.

Kamal Sbih, the owner of the Covington I.H.O.P., testified that Haste and Solano were working for him at the time of the trial, although Solano had been suspended in the past for disobedience. He noted several reasons for

McGivney's termination including tardiness, her register being short, and for being inebriated at work. Sbih also stated that McGivney was suing I.H.O.P. Sbih testified that the victim never complained to him about the defendant. He further stated that he received complaints from only Solano regarding the defendant. Specifically, Solano told Sbih that the defendant touched her inappropriately while they were in a walk-in cooler alone.[2]

On April 15, 2008, the trial court sentenced Mohamed to 17 years imprisonment, the first two years of the sentence to be served without benefit of probation, parole or suspension of sentence.[3]

Mohamed appealed.  On March 27, 2009, Mohamed's conviction and sentence were affirmed by the Louisiana First Circuit Court of Appeal.  The court of appeal rejected his claims of improper admission of other crimes evidence, insufficiency of the evidence and error in denying his motion for new trial and for reconsideration of sentence.[4]  Mohamed did not seek review of the judgment in the Louisiana Supreme Court and, as such, his conviction became final 30 days later.

On or about September 9, 2009, Mohamed filed a *pro se* "writ of review" with the state district court.[5]  In that application, he raised a claim of ineffective assistance of trial counsel

---

[2] State Rec., Vol. 3 of 4, *State v. Mohamed*, 08-KA-1894, 2009 WL 838599  (La. App. 1st Cir. March 27, 2009)  (unpublished decision).

[3] State Rec., Vol. 1 of 4, Minute Entry, April 15, 2008 (sentencing).

[4] State Rec., Vol. 3 of 4, *State v. Mohamed*, *supra.*

[5] *Id.*, Writ of Review bearing affidavit verified September 9, 2009 and filed into the 22nd J.D.C. on September 14, 2009.  Federal *habeas* courts must apply Louisiana's "mailbox rule"

based on his attorney's alleged inadequate investigation and defense at trial.  The district court did not issue a ruling and it appears that Mohamed did not pursue the application any further.

On April 11, 2011, Mohamed filed through counsel of record an application for post-conviction relief in the state district court.[6]  In that application, he asserted that counsel rendered ineffective assistance for failure to subpoena witnesses, improper comments during opening statement and failure to object to a witness' testimony.   On June 22, 2011, the state district court denied relief on the merits.[7]  On September 14, 2011, the Louisiana First Circuit Court of Appeal denied his related writ application without stated reasons.[8]  Mohamed did not pursue further review of these claims in the Louisiana Supreme Court.

On August 31, 2011, Mohamed submitted a letter to the state district court requesting

---

when determining the filing date of a Louisiana state court filing, and therefore such a document is considered "filed" as of the moment the prisoner "placed it in the prison mail system." *Causey v. Cain*, 450 F.3d 601, 607 (5th Cir. 2006). If that date cannot be gleaned from the state court record with respect to the filing, this Court will use the signature date of the applications as the filing date, in that the various applications were obviously placed in the mail no earlier than the date they were signed. In those instances where no signature date appears on a document and no other evidence is available, the Court will look to the file-stamp placed on the document by the clerk of court.

[6] *Id.*, Uniform Application for Post-Conviction Relief bearing a file-date stamp of April 11, 2011 filed by attorney of record Frank DeSalvo.

[7] *Id.*, District Court Judgment denying PCR and Reasons for Judgment signed June 22, 2011.

[8] *Id.*, *State v. Mohamed*, 2011-KW-1336 (La. App. 1st Cir. Sep. 14, 2011) (unpublished writ). A copy of this writ application could not be located in the state court record.

relief in connection with his pending deportation proceedings.[9] The district court denied relief on September 21, 2011, noting it had no jurisdiction in the matter.  On September 26, 2011, Mohamed filed a motion in the state district court requesting copies of transcripts.[10] The motion was denied the same day.  On October 24, 2011, he filed a motion for production of documents in the state district court.[11] That motion was denied on December 14, 2011.

On June 4, 2012, Mohamed filed a letter with the state district court in which he requested permission to "reappear in court under new discovered evidence."[12]  On June 7, 2012, the district court denied relief on the showing made.[13]  Mohamed did not file an application for supervisory review in the appellate courts.

On January 23, 2013, Mohamed through counsel of record filed a second application for post-conviction relief in the state district court, along with a motion for leave to supplement.[14] In the application, Mohamed asserted that he was actually innocent as shown by newly

---

[9] *Id.*, Mohamed correspondence dated August 31, 2011, stamped as filed in the district court on September 6, 2011.

[10] *Id.*, Motion requesting copies of verbatim transcript, *Boykin* examination, guilty plea and sentencing hearing, court minutes, bill of information filed on September 26, 2011.

[11] *Id.*, Motion for Production of documents filed October 27, 2011.

[12] *Id.*, Mohamed correspondence filed in state district court on June 4, 2012.

[13] *Id.*, *see* handwritten notation on letter dated June 7, 2012.

[14] *Id.*, Uniform Application for Post-Conviction Relief, Memorandum in Support of Post-Conviction Relief and Motion/Memorandum in Support of Leave to Supplement, filed by attorney of record Brad Scott.

discovered evidence supported by affidavits from two new witnesses and wrongly convicted due to ineffective assistance of counsel in the following respects:  (a) failing to investigate the bias of state witness, Kristene Haste, and interview other crucial witnesses for the defense; (b) failing to subpoena a witness for the defense; (c) comments made during cross-examination of the victim; (d) failing to introduce phone records and (e) comments made during closing argument.  On April 4, 2013, the state district court denied relief, finding the ineffective assistance of counsel claim both time-barred and repetitive.[15]  On July 1, 2013, the Louisiana First Circuit denied his related writ application as untimely under Louisiana Code of Criminal Procedure article 930.8.[16]  On June 13, 2014, the Louisiana Supreme Court denied his writ application without stated reasons.[17]

On December 14, 2014, Mohamed filed the instant federal application seeking *habeas corpus* relief.[18]  He asserts that he is actually innocent based on newly discovered evidence and

_____

[15] *Id.*, District Court Judgment and Reasons signed April 4, 2013.

[16] *Id.*, *State v. Mohamed*, 2013-KW-0718 (La. App. 1st Cir. July 1, 2013) (unpublished writ).

[17] *State v. Mohamed*, 2013-KP-1841 (La. 6/13/14), 140 So.3d 1182; State Rec., Vol. 4 of 4.

[18] Rec. Doc. 4. "A prisoner's habeas application is considered 'filed' when delivered to the prison authorities for mailing to the district court." *Roberts v. Cockrell*, 319 F.3d 690, 691 n. 2 (5th Cir.2003). Here, the record reflects that Mohamed signed his federal application on December 14, 2014, the earliest date on which he could have delivered it to prison officials for mailing.

that his trial counsel was constitutionally ineffective in that he failed to investigate the bias of state witness, Kristene Haste, and interview other defense witnesses; to subpoena his roommate as a defense witness; to introduce phone records; and made improper comments during trial.

The State argues that Mohamed's petition is untimely, procedurally barred and also that the claims are meritless. For the following reasons, the Court finds the petition to be untimely.

## II. *Analysis*

### A. *Statute of Limitations*

The Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), codified at 28 U.S.C. § 2241 *et seq*., governs the filing date for this action because petitioner filed his federal *habeas* petition after the AEDPA's effective date. *Lindh v. Murphy*, 521 U.S. 320, 117 S.Ct. 2059, 138 L.Ed.2d 481 (1997). The AEDPA includes a one-year period of limitations for *habeas* petitions brought by prisoners challenging state court judgments. Title 28 U.S.C. § 2244(d) provides, in pertinent part:

(1)   A 1–year period of limitation shall apply to an application for a writ of habeas corpus by a person in custody pursuant to the judgment of a State court. The limitation period shall run from the latest of—

A.   the date on which the judgment became final by the conclusion of direct review or the expiration of the time for seeking such review;

B.   the date on which the impediment to filing an application created by State action in violation of the Constitution or laws of the United States is removed, if the applicant was prevented from filing by such State action;

9

C.     the date on which the constitutional right asserted was initially recognized by the Supreme Court, if the right has been newly recognized by the Supreme Court and made retroactively applicable to cases on collateral review; or

D.     the date on which the factual predicate of the claim or claims presented could have been discovered through the exercise of due diligence.

The State argues that Mohamed's petition is time-barred pursuant to Subsection (A), which requires that a petitioner bring his Section 2254 claims within one (1) year of the date on which his underlying criminal judgment becomes "final." As to finality, the United States Fifth Circuit Court of Appeals has explained:

The statute of limitations for bringing a federal habeas petition challenging a state conviction begins to run on "the date on which the [state] judgment became final by the conclusion of direct review or the expiration of the time for seeking such review." 28 U.S.C. § 2244(d)(1)(A). When a habeas petitioner has pursued relief on direct appeal through his state's highest court, his conviction becomes final ninety days after the highest court's judgment is entered, upon the expiration of time for filing an application for writ of certiorari with the United States Supreme Court. *Roberts v. Cockrell*, 319 F.3d 690, 693 (5th Cir.2003). However, "[i]f the defendant stops the appeal process before that point," ... "the conviction becomes final when the time for seeking further direct review in the state court expires." *Id.* at 694; *see also Foreman v. Dretke*, 383 F.3d 336, 338 (5th Cir.2004) ( Section 2244(d)(1)(A) gives alternative routes for finalizing a conviction: either direct review is completed or the time to pursue direct review expires).

Although federal, not state, law determines when a judgment is final for federal habeas purposes, a necessary part of the finality inquiry is determining whether the petitioner is still able to seek further direct review. *See Foreman*, 383 F.3d at 338–39. As a result, this court looks to state law in determining how long a prisoner has to file a direct appeal. *See Causey v. Cain*, 450 F.3d 601, 606 (5th Cir.2006); *Roberts*, 319 F.3d at 693. Louisiana Supreme Court Rule X, § 5(a) states that an application "to review a judgment of the court of appeal either after an appeal to that court ... or after a denial of an application, shall be made

within thirty days of the mailing of the notice of the original judgment of the court of appeal."

*Butler v. Cain*, 533 F.3d 314, 317 (5th Cir.2008).

In this case, the Louisiana First Circuit Court of Appeal affirmed Mohamed's conviction and sentence on March 27, 2009.  Under Louisiana law, he then had 30 days to file a writ application with the Louisiana Supreme Court to challenge that judgment.  Louisiana Supreme Court Rule X, § 5(a).  Because he filed no such application within that deadline, his state criminal judgment became final for purposes of the AEDPA on April 27, 2009.[19]  The federal limitations period then expired one year later, unless the deadline was extended through tolling.

B. *Statutory and equitable tolling*

The AEDPA itself provides for interruption of the one-year limitations period. Section 2244(d)(2) provides that "[t]he time during which a *properly* filed application for State post-conviction or other collateral review with respect to the pertinent judgment or claim is pending shall not be counted toward any period of limitation under this subsection." 28 U.S.C. § 2244(d)(2) (emphasis added).  By its plain language, this provision does not create a new, full, one-year term within which a federal *habeas* petition may be filed at the conclusion of state court post-conviction proceedings. *Flanagan*, 154 F.3d 196, 199 n. 1 (5th Cir. 1998).

---

[19] The 30th day was Sunday, April 26, 2009, leaving the final day to fall on the next nonholiday, Monday, April 27, 2009. La. C.Cr.P. art. 13; Fed.R.Civ.P. 6(a)(1)(C).

11

Because this statute is a tolling provision, the time during which state court post-conviction proceedings are pending is merely subtracted from the one-year limitations period. *Id.*

The United States Supreme Court has explained: "[A]n application is 'properly filed' when its delivery and acceptance are in compliance with the applicable laws and rules governing filings. These usually prescribe, for example, the form of the document, the time limits upon its delivery, the court and office in which it must be lodged, and the requisite filing fee." *Artuz v. Bennett*, 531 U.S. 4, 8, 121 S.Ct. 361, 148 L.Ed.2d 213 (2000). Regarding time limits, the Supreme Court has held that when the state courts dismiss an application as untimely under state law, such an application cannot be considered to have been "properly filed," and, therefore, cannot toll the federal limitations period. *Pace v. DiGuglielmo*, 544 U.S. 408, 414, 125 S.Ct. 1807, 161 L.Ed.2d 669 (2005) ("When a postconviction petition is untimely under state law, that is the end of the matter for purposes of § 2244(d)(2)." (quotation marks and brackets omitted)); *see also Nellon v. Cain*, Civ. Action No. 10–4430, 2012 WL 1142539, at *4 (E.D.La. Jan.25, 2012), *adopted*, 2012 WL 1089232 (E.D.La. Mar.30, 2012).

After one-hundred thirty-four days (134) elapsed, Mohamed filed a "writ of review" in the state district court. The State argues that this writ did not serve to toll the limitations period because it was not 'properly filed' on the form required under Louisiana law, La. C.Cr.P. art. 926. While the writ may have been deficient in form, the district court did not issue a ruling to that effect and the record contains no evidence that the district court ever ruled on Mohamed's writ of review. The State has cited no case law supporting a determination by a

federal *habeas* court in the first instance that a state court application did not comply with state procedural law so as to deny tolling credit for that filing under the AEDPA. Furthermore, the State argues the instant petition is untimely regardless of the outcome of this issue. Therefore, the Court will afford Mohamed tolling credit for the pending writ of review.

That writ of review remained pending before the state district court without a ruling until April 11, 2011, when Mohamed's retained counsel filed an application for post-conviction relief in the state district court reasserting his claim of ineffective assistance of counsel. That application was denied on the merits, and the court of appeal denied supervisory relief on September 14, 2011. At this point, Mohamed had 30 days in which to proceed to the next level of review by filing a writ application with the Louisiana Supreme Court. La. S. Ct. Rule X, § 5(a). Because he did not do so, however, any tolling ceased when the 30-day period expired on October 14, 2011. At this point, Mohamed had 231 days remaining, or until Monday June 4, 2012, in which to file his federal application.[20]

Affording Mohamed the benefit of any doubt, the next filing of record that even arguably could have served to toll the limitations period was his letter to the state court filed on Monday, June 4, 2012.[21] Even assuming that pleading, filed on the final day of the federal

---

[20] Because June 2, 2012 fell on a Saturday, he had until the next business day, or June 4, 2012, to file his federal application.

[21] State Rec., Vol. 3 of 4 (correspondence filed June 4, 2012). The Court notes that during the relevant time period, on October 24, 2011, Mohamed also filed a motion for production of documents. However, that pleading clearly did not serve to toll the one-year

one-year limitations period, tolled the limitations period as long as it remained pending, the state district court denied the motion on June 7, 2012, and Mohamed did not seek supervisory review of that ruling in the court of appeal within 30 days of the lower court's ruling. Therefore, his post-conviction application ceased to be pending when the 30 days ended on July 9, 2012.[22] The federal limitations period expired the next day, July 10, 2012. Mohamed's second counseled post-conviction relief application filed on January 23, 2013, long after the one-year limitations period had expired, provided no tolling benefit under the statute.[23] *Scott v. Johnson*, 227 F.3d 260, 263 (5th Cir.2000) (state post-conviction application did not toll federal limitations period when it was filed after the period of limitation had expired); *Matos v. Rader*, 2013 WL 663759 (E.D. La. Feb.2, 2013)(state post-conviction applications filed after the expiration of the federal statute of limitations have no bearing on the timeliness of a federal *habeas* application). Mohamed's federal application, filed on December 14, 2014, was therefore untimely.[24]

---

limitations period. *See*, *e.g.*, *Guy v. Tanner*, 2014 WL 5364821, *5 n. 37 (E.D. La. Oct. 21, 2014).

[22] July 7, 2012 and July 8, 2012 fell on Saturday and Sunday, respectively.

[23] Importantly, because the application was dismissed as untimely under state law, it could not have tolled the federal limitations period.

[24] Although he filed a memorandum in reply, Mohamed did not address the State's argument concerning timeliness or argue that any alternate provision under §2244(d)(1) applies. The State addresses only subsection (A). Even if Mohamed were to argue that subsection (D) was applicable, which he has not, that contention would fail. Mohamed would not be entitled to a later start date based on any alleged discovery of new evidence. The focus

Although Mohamed does not address the issue, the Court next briefly considers equitable tolling.  The one-year limitations period may be equitably tolled in rare and exceptional circumstances where a petitioner can establish that he diligently pursued his rights and that an extraordinary circumstance hampered his ability to file his petition within the one-year federal limitations period.  *See Pace v. DiGuglielmo*, 544 U.S. 408, 418, 125 S.Ct. 1807, 161 L.Ed.2d 669 (2005).  In the instant case, however, Mohamed has brought forth no evidence demonstrating that he is entitled to equitable tolling, and the Court is aware of no circumstances existing that would warrant equitable tolling of the statute of limitations.

C.  *Actual innocence*

Mohamed incorporates his innocence argument into his substantive Sixth Amendment claims and argues, *inter alia*, that counsel rendered ineffective assistance by not obtaining certain witness testimony that would show he was actually innocent.  Petitioner must first overcome the procedural hurdle of AEDPA's statute of limitations before the Court may review the merits of his claim.  Broadly construing the claim, the Court will consider whether his purported actual innocence excuses the untimely filing of the instant § 2254 petition, thereby allowing the Court to reach the merits of his Sixth Amendment claims.

Actual innocence, if proved, may overcome the expiration of AEDPA's one-year statute

---

of subsection (D) is the factual predicate underlying his ineffective assistance of counsel claim, namely his attorney's failure to interview two of his co-employees and present their testimony at trial.  Mohamed was aware of the factual predicate underlying his claim long before he obtained the affidavits, which he uses now to bolster that ineffective assistance claim.

of limitations.  *McQuiggin v. Perkins*, 133 S.Ct. 1924, 1928, 185 L.Ed.2d 1019 (2013).  To be

credible, however, "such a claim requires [a] petitioner to support his allegations of

constitutional error with new reliable evidence — whether it be exculpatory scientific

evidence, trustworthy eyewitness accounts, or critical physical evidence — that was not

presented at trial." *Schlup v. Delo*, 513 U.S. 298, 324, 115 S.Ct. 851, 130 L.Ed.2d 808 (1995).

The Supreme Court has cautioned that "tenable actual-innocence gateway pleas are rare: '[A]

petitioner does not meet the threshold requirement unless he persuades the district court that,

in light of the new evidence, no juror, acting reasonably, would have voted to find him guilty

beyond a reasonable doubt.' " *McQuiggin*, 133 S.Ct. at 1928 (quoting *Schlup v. Delo*, 513 U.S. at

329.

     In support of his innocence claim, Mohamed submits handwritten, notarized letters

from two IHOP employees, both of whom he claims to have worked closely with during his

time as general manager for the restaurant.[25]  The first two letters were authored by Vivian

Beaudoin purportedly in January and February 2012, about four years after Mohamed's

---

[25] Rec. Doc. 4-1, Exhibits to Memorandum in Support, pp. 19-25.  The letters apparently were mailed in connection with his immigration proceedings.  The State questions the date of the letter written by Beaudoin and points to a discrepancy between the date the letter was notarized (February 2012) and the date of the postmarked envelope to the Egyptian Embassy (January 2012).  However, counsel for Mohamed explained in the January 2013 state post-conviction application that Beaudoin wrote and separately mailed two letters, one on January 26, 2012 and another one, substantially similar to the first, which was notarized on February 6, 2012.  State Rec., Vol. 3 of 4, Memorandum in support of post-conviction relief application, see footnotes 11-13.

conviction.  Beaudoin was employed at IHOP as a server at the time that Mohamed served as general manager for the restaurant.  In the letters, she states that she had never witnessed any inappropriate behavior by Mohamed with anyone, including herself, during her employment. She attested to his good character and expressed her utmost respect for him and belief that the allegations against him were not true.

The next letter was authored by Josette Bigner, purportedly on April 26, 2012.  Bigner was an assistant manager at IHOP at the same time Mohamed was employed as general manager.  Her letter pertains to several conversations she claims to have been "privy to" between the victim and another assistant manager, Kristene Haste, who took over as general manager following Mohamed's termination.  In the letter, she states that "on several occasions she heard [the victim] and Ms. Haste discussing and laughing at the situation concerning Mr. Mohamed and how the two of them conspired and fabricated the allegations against him."  She further states that she heard Haste use the exact words "we got him good."  Based on the conversations she heard and what she terms "bragging" on the part of Haste and the victim, she believes the charges against Mohamed are false, and that the two women "concocted and fabricated" the story to further Haste's career.  The letter further attests that Mohamed was professional at all times with her and other employees at work and when she visited him at his home.

Even assuming the letters first submitted by Mohamed to the state courts five years after his conviction and sentence constitute "new" evidence, which is doubtful considering

17

Mohamed's admission that he knew all along these individuals possessed material information relevant to his case that his attorney failed to obtain,[26] they still fail to establish a colorable claim of actual innocence.  The belated handwritten letters attesting to Mohamed's character and suggesting suspicion for falsifying the rape allegation do not qualify as "exculpatory scientific evidence, trustworthy eyewitnesses accounts, or critical physical evidence." The letters plainly do not constitute exculpatory scientific evidence or critical physical evidence. Nor can these individuals offer any direct eyewitness account as neither Beaudoin nor Bigner have any personal knowledge of what transpired between the victim and Mohamed at his residence.  Beaudoin and Bigner merely attest to their opinion of Mohamed's character and reputation based on their personal interactions with him, and those opinions obviously differed from the interactions and opinions formed by several other female employees who testified at trial.  The new subjective character statements do not constitute reliable evidence that support a claim that Mohamed was factually innocent of forcible rape.

Furthermore, Bigner's letter recounts only generally that she heard conversations between the victim and Haste that led her to believe false rape accusations were made against Mohamed by the victim so that Haste could be promoted to his general manager position.  The letter is devoid of any specific dates, times, place, or details surrounding the alleged conversations.  She offers only vague and generalized notions with respect to conversations

---

[26] See Rec. Doc. 4, pp. 14-15.

she claims to have "heard." Curiously, she never says she was engaged as a participant with the victim or Haste in those conversations. Even taking the letter at face value, it amounts to only her subjective interpretation and supposition based on overhearing conversations, which in and of itself is an inherently unreliable means of obtaining precise or accurate information. Like the character statements, Bigner's subjective beliefs based on purported conversations she overheard at some unspecified time and place do not constitute reliable evidence that supports a claim that Mohamed was factually innocent of forcible rape.

Additionally, in analyzing the newly submitted evidence, the Court "may consider how the timing of the submission and the likely credibility of the affiants bear on the probable reliability of that evidence." *Schlup*, 513 U.S. at 322. The inexplicable delay in Mohamed's production of these letters from witnesses whom he knew existed at the time of trial and believed had valuable information to support his defense undermines the credibility of his actual innocence claim.

Further, the Court is unpersuaded that with this new evidence no juror, acting reasonably, would have found him guilty. The evidence of Mohamed's guilt at trial was substantial. The evidence included direct testimony by the victim detailing the circumstances of the rape. Her testimony was emotional and compelling. She was 17 years old and worked as a cashier at IHOP at the time of the incident. She accepted a ride with Mohamed on the day in question because she did not own a vehicle. She asked Mohamed to bring her home, but he refused and brought her to his apartment instead. She remained there only because she had

no means of transportation or communication available.   She tried to resist his sexual advances and told him to stop, but he put his hand over her mouth, overpowered her and then raped her.

The victim reported the rape to several individuals, including her childhood friend, Julie Sciple, and Haste, who both testified at trial and described the victim's distress when relating the story to them.   The victim also reported the rape to the police.   Detective Gaudet testified at trial regarding the report and investigation.   Three female employees testified that Mohamed made inappropriate sexual advances or comments to them on various occasions both within and outside of the employment context.  The jury also heard testimony revealing that two of the employees, Solano and McGivney, had disciplinary problems at work; Solano had been suspended multiple times and McGivney was ultimate fired.   They also heard testimony that Haste was trained for Mohamed's job before he left and stood to take the job of general manager in his absence and actually did so.   However, Haste expressly denied that she encouraged the victim to make up the report so that she could become the general manager.[27]  One employee report, made by Solano, regarding inappropriate sexual contact by Mohamed was confirmed by Mohamed's superior and owner of IHOP, Kamal Sibh, who testified that Solano did indeed complain to him directly about Mohamed's behavior. Mohamed took the stand and denied that the rape occurred.  He offered a different version of

---

[27] State Rec., Vol. 2 of 4 (Haste), p. 303.

events that transpired, which the jury obviously rejected.

Mohamed contends the new evidence would have challenged the testimony offered by the victim and Haste and established that the rape allegation was a fabricated conspiracy to remove Mohamed from his position so that Haste could be promoted.  Even if, as Mohamed suggests, the testimony of these two witnesses could have created a reasonable doubt in the minds of some jurors, this evidence does not satisfy the exacting standard for proving actual innocence for which a petitioner must demonstrate that it is more likely than not that *no* reasonable juror would have convicted him in light of the new evidence.  *Schlup*, 513 U.S. at 327 (emphasis added).  Weighing all of the evidence in this case, including the newly submitted belated notarized letters, Mohamed has failed to make a sufficient showing of actual innocence to excuse the untimeliness of his federal petition.

Because the instant petition was filed after the federal limitations period expired and Mohamed has failed to demonstrate that tolling principles render his petition timely, or that he is entitled to review of his claims through the "actual innocence" gateway, his federal *habeas* petition should be dismissed with prejudice as untimely.

**RECOMMENDATION**

**IT IS RECOMMENDED** that Mohamed's application for federal *habeas corpus* relief be **DISMISSED WITH PREJUDICE** as untimely.

A party's failure to file written objections to the proposed findings, conclusions, and recommendation in a magistrate judge's report and recommendation within fourteen (14)

days after being served with a copy shall bar that party, except upon grounds of plain error,

from attacking on appeal the unobjected-to proposed factual findings and legal conclusions

accepted by the district court, provided that the party has been served with notice that such

consequences will result from a failure to object. 28 U.S.C. § 636(b)(1); *Douglass v. United*

*Services Auto. Ass'n*, 79 F.3d 1415, 1430 (5th Cir.1996) (*en banc*).[28]

New Orleans, Louisiana, this <u>1st</u> day of <u>September</u>, 2015.

<u>                                        </u>
**MICHAEL B. NORTH**
**UNITED STATES MAGISTRATE JUDGE**

---

[28]   *Douglass* referenced the previously applicable ten-day period for the filing of objections. Effective December 1, 2009, 28 U.S.C. § 636(b)(1) was amended to extend that period to fourteen days.